

_____
Honorable Gary Spraker
United States Bankruptcy Judge

Entered on Docket
September 29, 2020

# UNITED STATES BANKRUPTCY COURT

## DISTRICT OF NEVADA

* * * * * *

| | |
|---|---|
| In re: | Case No.: 16-16656-mkn |
| DRAFT BARS LLC, | Chapter 7 |
| Debtor(s). | Adversary No.: 17-01176-gs |
| DRAFT BARS LLC, | <u>Hearing Date</u><br>DATE:  December 17, 2019<br>TIME:   2:00 p.m. |
| Plaintiff(s), | |
| vs. | |
| ANHEUSER-BUSCH LLC, a Nevada limited liability company; ANHEUSER-BUSCH COMPANIES LLC, a Missouri limited liability company, | |
| Defendant(s). | |

### MEMORANDUM DECISION ON MOTION TO DISMISS AND/OR MOTION FOR SUMMARY JUDGMENT

Defendants Anheuser-Busch LLC and Anheuser-Busch Companies LLC (together, "Anheuser-Busch") move for dismissal or partial summary judgment against plaintiff/debtor Draft Bars LLC's ("Draft Bars") claims for breach of contract (Count I), breach of implied covenant of good faith and fair dealing (Count II), unjust enrichment (Count III), and promissory estoppel (Count IV).  Anheuser-Busch contracted with Draft Bars to construct a number of mobile units for use at various events across the country.  Though Anheuser-Busch purchased

these mobile units, it also agreed that Draft Bars could retain and manage these units for a period of time.

The dispute between these parties rests with the agreement, or lack thereof, pursuant to which Draft Bars could operate the mobile units. Draft Bars contends that Anheuser-Busch contractually agreed to Draft Bars' retention and use of the mobile units so long as they were used to sell only Budweiser beer. Anheuser-Busch denies any such contract, though the record demonstrates that it had Draft Bars store and operate some of the mobile units Draft Bars constructed. For the reasons discussed below, the court finds summary judgment in favor of Anheuser-Busch appropriate against Draft Bars' claims breach of contract, breach of implied covenant of good faith and fair dealing, and promissory estoppel. The court will deny summary judgment on the debtor's claim of unjust enrichment as there remains genuine issues of material fact on that claim.

**FACTS**

## I. Pre-Petition

Draft Bars is a Nevada business, wholly owned by Michael Manion, that constructed mobile bar units referred to as "Bar Pods," which Draft Bars refers to as "mobile assets."[1] Beginning in 2015, Anheuser-Busch placed nine purchase orders with Draft Bars for nine Bar Pods.[2] Anheuser-Busch and their distributors used the Bar Pods to market Budweiser beer at various events in an effort to increase consumer exposure.[3] Draft Bars constructed and delivered a number of the Bar Pods to Anheuser-Busch, but not all of them.[4]

---

[1] Plaintiff's Opposition, Declaration of Michael Manion (Manion Decl.), ECF No. 104-1, p. 25, ¶¶ 1-2.
[2] Defendants' Statement of Undisputed Facts, ECF No. 97-1, p. 2, ¶ 6; *see also* Defendants' Motion, ECF No. 97-2, Exhs. 2-8.
[3] Plaintiff's Opposition, ECF No. 104-1, Exh. 2, pp. 36-37 (Opsahl Dep. Tr. at 11:24-12:10).
[4] *See* Defendant's Motion, ECF No. 97-1, Exh. 1, p. 3 (Manion Dep. Tr. at 82:11-12) (Anheuser-Busch is "missing one" Bar Pod). The construction of the Bar Pods is not at issue in this action, though much of Draft Bars' opposition to the pending motion is devoted towards showing how pleased Anheuser-Busch was with its performance and the products.

Anheuser-Busch often requested additional services in addition to constructing the Bar

Pods.  As Manion explained it:

> As Draft Bars demonstrated competency, loyalty
> and excellence in its product, AB increasingly
> engaged Draft Bars to manage the Bar Pods that AB
> had purchased.  The "management" of the Bar Pods
> appears to have been ill defined, but entailed Draft
> Bars retaining them at its costs and delivering them
> to various events at the request of Anheuser-Busch
> or their distributors.  These requests were verbal,
> with Purchase Orders often created after the event
> or work had been completed or nearly completed.[5]

Anheuser-Busch requested that Draft Bars deliver and manage the Bar Pods at the Super Bowl

and other large events.[6]  Anheuser-Busch also permitted Draft Bars to manage the Bar Pods for

other events.[7]

In September 2015, Anheuser-Busch asked Manion to assist it with building the Paris

Hotel Beer Park.[8]  According to Manion, he secured the contractor and brought in $2,334,000 for

Anheuser-Busch's project.[9]  Manion also stated that afterwards Anheuser-Busch issued a partial

purchase order for $1,422,000 dated October 21, 2015,[10] but instructed him that he could not

invoice Anheuser-Busch's purchase order for the balance until January 2016.[11]

Most of Draft Bars' contact with Anheuser-Busch during the fall of 2015 came from Ari

Opsahl, Anheuser-Busch's then-director of sales and marketing, who oversaw its mobile asset

program.[12]  Manion states that Opsahl requested Draft Bars submit a proposal to manage the Bar

Pods "for events."[13]  Draft Bars submitted a proposal to Anheuser-Busch in August 2015, shortly

---

[5] Plaintiff's Opposition, Manion Decl., ECF No. 104-1, p. 26, ¶14.
[6] *Id.* at p. 27, ¶ 15.
[7] *Id.*
[8] *Id.* at ¶ 19.
[9] *Id.*
[10] *Id.*; *see also* Defendant's Motion, Exh. 15, ECF No. 97-2, pp. 171-175.
[11] *Id.*
[12] *Id.* at p. 26, ¶ 4.
[13] *Id.* at p. 28, ¶ 26.

before it undertook assisting Anheuser-Busch with the Paris Hotel Beer Park.[14] Manion contends that the proposal he submitted became what he refers to as the "Sustainable Marketplace Agreement" between Draft Bars and Anheuser-Busch. As evidence of this agreement, Draft Bars relies on a one-paragraph email dated November 15, 2015, sent by Opsahl to Manion's personal email address:

> Mike - we are trying to expand our mobile asset strategy beyond the contracted events that we have with you and Fusion. What we would like to do is have you activate the PODs at your own expense negotiated with the event that is requesting. We can provide the beer for the events to help cover your cost. Does that make sense? It's a model we have looked into with the food trucks to lower or eliminate ABs [sic] operating costs. You are more than welcome and encouraged to advertise these assets in the marketplace as long as the product being sold is AB.[15]

Opsahl testified in his deposition that the possibility of Anheuser-Busch providing beer to Draft Bars "might have worked," but the idea required the approval of Anheuser-Busch's legal department.[16] Manion contends that Anheuser-Busch never supplied beer to Draft Bars for events as offered by Opsahl.[17]

Anheuser-Busch tells a different story. It states that the company held a "competitive bid process" to determine who would manage and operate all of its mobile assets, including the Bar Pods.[18] As a result of this process, Anheuser-Busch selected Fusion Marketing, not Draft Bars, to operate its mobile assets.[19] An email dated October 12, 2015 email from Matt Whittington,

---

[14] *Id.*
[15] Defendant's Motion, Exh. 22, ECF No. 97-3, p. 30.
[16] *Id.* at Exh. 39, ECF No. 97-4, p. 53:13-23.
[17] *Id.* at Exh. 1, ECF No. 97-1, p. 14 (Manion Dep. Tr. at 199:21-24; 200:13-15).
[18] *Id.* at ECF No. 97, p. 4:3-6; *see also* Exhs. 19-20, ECF No. 97-3, pp. 15-27.
[19] *Id.* at Exh. 20, ECF No. 97-3, pp. 26-27.

Anheuser-Busch's Manager of Event Activation confirmed that Fusion was awarded management of the mobile assets:

> A few notes here based on Trade Marketing decisions:
>
> - Fusion will be managing/operating existing Build a Bar program going forward
>
> - Fusion will be managing/operating 4 new Bud Build a bar 2.0 units – Manion is building.[20]

Though the record before the court does not reveal to whom Whittington sent his email, the email chain begins with an email from Manion[21] addressed to Mike Beck of Fusion Marketing and copied to Opsahl and Whittington.[22]  Manion's email simply states: "That is awesome [sic] Beck we will need you to come to get trained after they are built."[23]  Anheuser-Busch asserts that this email exchange constituted notification to Manion that Draft Bars was not selected to operate and manage the mobile assets.[24]

Notwithstanding Anheuser-Busch's rejection of Draft Bars' request to manage the mobile assets, Opsahl continued to be pleased with their performance.  On March 15, 2016, Opsahl executed a "testimonial" praising Draft Bars under the categories of "products," "partnership," and "customer service."[25]  Opsahl described Draft Bars' customer service as "world class," and stated, "This is the type of customer service that ensures we continue to do business with these guys for many years to come."[26]

---

[20] *Id.*

[21] Although the email at issue states that it is from "Michael Adrian," Manion's full name is Michael Adrian Manion.  *See* Defendant's Motion, Exh. 1, ECF No. 97-2, p. 16 (Manion Dep. Tr. p. 289).

[22] *Id.* at Exh. 20, ECF No. 97-3, pp. 26-27.

[23] *Id.* at p. 26.

[24] *Id.*, Statement of Undisputed Facts, ECF No. 97-1, p. 4, ¶ 15.

[25] Plaintiff's Opposition, Exh. 19, ECF No. 104-1, p. 104.

[26] *Id.*

Although Draft Bars had not been selected to operate and manage Anheuser-Busch's mobile assets, Manion testified that Draft Bars would at times operate the Bar Pods for Fusion or Freeman XP, a third entity involved with Anheuser-Busch and its mobile assets.[27] On other occasions, however, Draft Bars would be paid directly by Anheuser-Busch for Anheuser-Busch events.[28]  Manion has described the disorganized nature of Draft Bars' relationship with Anheuser-Busch, noting that Draft Bars eventually had to register the Bar Pods with the state of Nevada for Anheuser-Busch, but used Draft Bars' own address, and even paid the insurance on them.[29]  Manion largely attributes the disorganization to changing his contacts with Anheuser-Busch.

A string of emails from May 2016 demonstrates the loose and disjointed relationship between Anheuser-Busch, Fusion, and Draft Bars.[30]  On May 3, 2016, Whittington sent an email announcing he was leaving Anheuser-Busch, and directing the recipients to reach out to their local Anheuser-Busch Trade Marketing Manager regarding mobile asset needs, and to various people at Fusion for Build a Bar needs.[31]  Manion asked in reply whether everyone was supposed to contact distributors for mobile assets, and then followed: "Were [sic] not even on the list to contact.  We really have been placing and running everything for the pods on our own which we like, however a structure with AB and a plan would be the correct way to do this."[32]  Josh Halpern, a vice president with Anheuser-Busch, responded: "Fusion runs our event activation.  Unless you are looking to run the Bud and Burgers program, this makes the most

---

[27]  Defendant's Motion, Exh. 1, ECF No. 97-1, p. 4 (Manion Dep. Tr. at 100:6-15).
[28] *Id.* (Manion Dep. Tr. at 101:11-14).
[29] *Id.*, Exh. 1, ECF No 97-1, p. 5 (Manion Dep. Tr. at 104:3-23); *see also id.* at Exh. 9, ECF No. 97-2, p. 89 (Anheuser-Busch service order dated May 31, 2016 for "Bar Pods Registration" in the amount of $150,836.40).
[30] Plaintiff's Opposition, Exh. 17, ECF No. 104-1, pp. 96-100.
[31] *Id.* at p. 99.
[32] *Id*.

amount of sense. Fusion is not a competitor to you even 1%."[33] Manion replied with interest in the Bud and Burgers program, and again requested a formal arrangement for Draft Bars to run the Bar Pods itself.[34] Halpern inquired as to Draft Bars' ability to handle the logistics of mobile asset events. Manion assured him that Draft Bars could staff and coordinate the events.[35] Halpern then invited Manion to send him a proposal for management of the Bar Pods, which Manion replied that he would send.[36] It appears that the Bud and Burgers program was either a subset of the mobile assets, or another program altogether, but beyond what Fusion or Draft Bars was doing at that time.

Later that May, Anheuser-Busch's director of procurement, Brian Lloyd, and Director of Trade Marketing-Event Strategy, Ryan Mortimer, exchanged a series of emails about Anheuser-Busch's arrangement with Draft Bars.[37] Mortimer asked Lloyd:

> Is this accompanied by some sort of agreement that talks about insurance requirements and other deliverables? **We aren't really signing into an agreement like we did with Fusion because I am not paying him anything for what we are doing**. Essentially we just want to make sure he knows he is responsible for the following:
>
> - Vehicle upkeep and maintenance
> - Proper liability and vehicle insurance
> - Post event recaps
> - Delivery of Macro units by 8/15
> - Or we hit him with a $1.2MM penalty[38]

In response to a brief message from Lloyd, Mortimer continued:

> I didn't plan on aligning to any OPEX costs for the program. Our "payment" is that **we are allowing him to operate the units and charge the respective wholesalers or properties for his**

---

[33] *Id.* at p. 98.
[34] *Id.*
[35] *Id.* at p. 97.
[36] *Id.* at p. 96.
[37] *Id.*, Exh. 10, ECF No. 104-1, pp. 71-73.
[38] *Id.* at p. 73 [emphasis added].

7

> **services just like he has been doing.** I will have
> him supply us with a rate card though so we know
> what he is charging. He will be responsible for all
> unit upkeep and maintenance.[39]

Lloyd requested a more detailed statement regarding Draft Bars' actual work for

Anheuser-Busch, and confirmed that any arrangement would need to be reviewed by Anheuser-

Busch's legal department.[40]

On June 2, 2016, Manion commenced an email exchange with Lloyd and Mortimer

regarding the status of outstanding payments.[41]  The emails continued in mid-June with Manion

requesting a telephone conference with Mortimer.[42]  Attached to the end of the email chain is an

undated letter from Manion addressed to Mortimer.[43]  The letter is instructive as to the nature of

the relationship between Draft Bars and Anheuser-Busch, from Manion's perspective:

> …I am reaching out to you before we are forced to
> close our doors. Without any form of contract, we
> have built exclusively for Anheuser-Busch and
> continue to do so…
>
> …Despite being given incorrect direction and
> countless miscommunications, we have taken it
> upon ourselves to look after your interests above
> our own. We have covered the costs associated
> with the following without knowing when and if we
> would be reimbursed:
>
> - Maintenance and cleaning
> - Regular services
> - Repairs to damages incurred from activations
> - Registration
> - Insurance
> - Temperature controlled indoor storage

---

[39] *Id.* at p. 72 [emphasis added].
[40] *Id.*
[41] Defendant's Motion, Exh. 23, ECF No. 97-3, pp. 32-35.
[42] *Id.* at p. 35.
[43] Though the letter is undated, Manion testified that it was sent to Mortimer in June 2016. *See* Plaintiff's Opposition, Exh. 1, ECF No. 104-1, p. 31, ¶ 59.

…Our day-to-day contacts and department heads within Anheuser-Busch, whom we rely on for direction, have consistently changed…

Under Matt Whittington's instruction that we would be responsible for managing, operating and activating the 6 existing assets we've built, we… leased 2 trucks, costing us $60,000 to date, employed a full logistics team, at a cost of $15,000 per month, and secured all necessary permitting, insurance ($10M policy at a cost of $35K per year) and licensing to operate.  For the last 12 months we have been activating them on your behalf both for direct Anheuser-Busch events and for other high profile events.  After being informed that there is no longer a budget for activations, we were left with no direction.  We came up with a plan for a sustainable market with Anheuser-Busch.  We started to manage all the Pods at our expense and activated at multiple events.  At this point Josh Halpern found out what we were doing and stepped in with his team to help create a plan of action where we would be regularly activating assets in association with Anheuser-Busch instead of on our own.  He was a great help and was giving us needed direction and support.  True to form, within weeks Josh was moved to another department and in doing so all of our progress was once again lost.  The amount of help we received from you in the last few weeks has been refreshing.  However, being informed that the assets are no longer under our management has left is with an infrastructure with no assets to activate. At this point, it has become a wasted and ongoing expense that we are stuck with.  We have trucks we have to pay for, insurance to cancel and staff we have to let go….

In order for us to deliver your product we are asking for assistance acquiring the outstanding balance:

- $193,549.38 for registration & sales tax
- $150,836.40 in registration & expenses for Super Bowl, SamCom and Colorado Springs activations
- $636,618.00 for Macro 4….

We understand these are your assets and it is your choice on who you want to operate them.  We just

9

want to tell you what we've done with your assets
on your behalf.[44]

On September 22, 2016, Manion emailed a list of the Bar Pods and their locations to Anheuser-Busch, noting again that he had "been paying to maintain them myself."[45]  He once again asked: "Can we get together and come up with a plan for this please."[46]

## II.    Post-Petition

Draft Bars filed its voluntary chapter 11 bankruptcy petition on December 16, 2016.[47]  Shortly after filing the bankruptcy, Draft Bars sent a letter to Anheuser-Busch notifying it of the bankruptcy filing and its inability to complete the Bar Pod it was constructing. [48]  The letter also sets forth Draft Bars' grievances against Anheuser-Busch, detailing its position regarding its history with Anheuser-Busch and the alleged breach of the Sustainable Marketplace Agreement..

Draft Bars operated in chapter 11 for roughly a year and a half before its case was converted to chapter 7 on May 16, 2018.[49]  Before the conversion of the case to chapter 7, Draft Bars commenced this adversary proceeding against Anheuser-Busch.  Draft Bars continues to assert that the Sustainable Marketplace Agreement was in place, and per Opsahl's testimonial, was intended to be in place for many years.  It accordingly sues for breach of contract (Count I), breach of implied covenant of good faith and fair dealing (Count II), unjust enrichment (Count III), and promissory estoppel (Count IV).

Anheuser-Busch initially sought dismissal of the complaint under Fed. R. Civ. P. 12(b)(6).[50]  That motion was denied.[51]  It now seeks summary judgment on the breach of

---

[44] Defendant's Motion, Exh. 23, ECF No. 97-3, pp. 36-38 [emphasis added].
[45] *Id.* at Exh. 24, ECF No. 97-3, p. 40.
[46] *Id.*at p. 41.
[47] *Id.* at Exh. 29, ECF No. 97-3, pp. 71-76.
[48] *Id.* at Exh. 25, ECF No. 97-3, pp. 44-46.
[49] ECF No. 184.
[50] ECF No. 10.
[51] ECF No. 14.

contract and breach of implied covenant of good faith and fair dealing causes of action based on Draft Bars' statements that no such contract existed.  Alternatively, Anheuser-Busch argues that Draft Bars cannot recover any lost profits as a matter of law, because the putative contract was terminable at will.  Anheuser-Busch also seeks summary judgment on Draft Bars' claims for unjust enrichment and promissory estoppel on the basis that Draft Bars' calculations of damages are unreliable, and that any management-related costs Draft Bars might have incurred were its own responsibility, at least until after Anheuser-Busch retrieved the Bar Pods.  Finally, Anheuser-Busch asks that the court confirm its right to setoff any liability that it may owe the estate against its prepetition claim against Draft Bars.

## ANALYSIS

Fed. R. Civ. P. 56(a), incorporated by Fed. R. Bankr. P. 7056, provides as follows: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Where, as here, the movant "will not have the burden of proof at trial, the movant need only establish an absence of evidence to support the nonmoving party's case."[52]  If the movant makes such a showing, "[t]he party opposing summary judgment bears the burden to 'produce some evidence, other than speculation or guesswork' sufficient to create a genuine dispute of material fact."[53]

A fact is material only if it is one that "under the governing substantive law . . . could affect the outcome of the case."[54]  A factual issue is genuine if "a jury could reasonably find in

---

[52] *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986); *Nissan Fire & Marine Ins. Co. v. Fritz Companies, Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000) ("In order to carry its burden of production, the moving party must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial.").

[53] *Tucson Electric Power Co. v. Pauwels Canada Inc.*, 651 Fed. Appx. 681, 682 (9th Cir. 2016) (quoting *Guidroz–Brault v. Missouri Pac. R.R. Co.*, 254 F.3d 825, 829 (9th Cir. 2001)).

[54] *Caneva v. Sun Communities Operating Limited Partnership (In re Caneva)*, 550 F.3d 755, 760 (9th Cir. 2008) (citing *Thrifty Oil Co. v. Bank of America Nat'l Trustee & Savings Ass'n.*, 322 F.3d 1039, 1046 (9th Cir. 2003)).

11

the nonmovant's favor from the evidence presented."[55]  All evidence is viewed in the light most favorable to the non-moving party.[56]

## I.    Breach of Contract

"To prevail on a breach of contract claim, a plaintiff must prove: (1) the existence of a valid contract; (2) a breach of that contract by the defendant; and (3) damages resulting from defendant's breach… ."[57]  The commencement of performance by one party evidences the parties' intent to be bound by the terms of the contract.[58]

There is a slight disconnect between the parties' arguments regarding Draft Bars' claims for breach of contract and breach of the covenant of good faith and fair dealing.  Anheuser-Busch has argued that summary judgment is required because Draft Bars repeatedly admitted that no contract existed.  It recited the applicable requirements to form a contract under Nevada law: an offer, acceptance, a meeting of the minds as evidenced by a manifestation of mutual intent to contract.[59] But Anheuser-Busch does not engage in any specific contract formation analysis.  Rather, it contends that Draft Bars' claims must be dismissed because it has previously admitted that there was never any contract.  In support of this argument, Anheuser-Busch points to the June 2016 email from Manion to Mortimer,[60] the September 22, 2016 email from Manion to Trey Wiegand and Anthony Berra,[61] and Manion's post-petition letter.

---

[55] *Emeldi v. University of Oregon*, 698 F.3d 715, 730 (9th Cir. 2012) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)); *see also Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1061 (9th Cir. 2002).

[56] *Caneva*, 550 F.3d at 772; *see also Singh v. Clinton*, 618 F.3d 1085, 1088 (9th Cir. 2010).

[57] *Shaw v. Citimortgage, Inc.*, 201 F.Supp.3d 1222, 1248 (D. Nev. 2016).

[58] Restatement of Contracts § 34(2) (1981) ("Part performance under an agreement may… establish that a contract enforceable as a bargain has been formed."); *see also* Vol. 1, Timothy Murray, Corbin on Contracts Vol. 1, § 4.1 at p. 1554  (Matthew Bender rev. ed. 2019) ("That one of [the parties], with the knowledge and approval of the other, has begun performance is nearly always evidence that they regard the contract as consummated and intend to be bound thereby.").

[59]  *May v. Anderson*, 119 P.3d 1254, 1257 (2005); *Shaw*, 201 F.Supp.3d at 1245-46.  Both parties apply Nevada law to Draft Bars' claims.  Accordingly, the court will accept that Nevada law governs these claims.

[60] *See* Defendant's Motion, Exh. 23, ECF No. 97-3, pp. 32-35.

[61] *See id.* at Exh. 24, ECF No. 97-3, pp. 40-42.

12

Draft Bars does not deny Manion's statements. Rather, it attempts to place them in context. It argues that the June 2016 letter[62] refers to a lack of any contract for the *construction* of the Bar Pods, not the *management* of them. Construing all reasonable inferences in favor of Draft Bars, as this court must on summary judgment, the court agrees with Draft Bars. There were individual purchase orders that governed Draft Bars' construction, and Anheuser-Busch's purchase, of the Bar Pods. But according to Draft Bars, that was to be the beginning, not the end, of its business with Anheuser-Busch. Draft Bars wanted to make its money managing the Bar Pods, and actively sought to use the Bar Pods to service Anheuser-Busch's direct events as well as those requested by its distributors. Draft Bars believed that the money it was to make was in the management of the Bar Pods, which was not covered by the purchase orders for their construction.

The September 22, 2016 email, December 19, 2016 letter[63] and even the June 2016 letter were each written after Anheuser-Busch had allegedly deviated from the Sustainable Market Agreement. These letters reflect the then-current status between the parties but do not necessarily negate the existence of a prior agreement.

Anheuser-Busch then argues that Draft Bars has failed to establish the formation of a valid contract, arguing that all Draft Bars has shown were proposals.[64] Here, it is critical to understand the terms of the proposed contract, its offer and acceptance. Draft Bars opposes summary judgment on its contract claim based on "a verbal agreement whose terms were reflected in Opsahl's email of November 15, 2015."[65] It defined the terms as:

> 1.    Anheuser-Busch would allow DraftBars to control the BarPods, which included maintaining, storing, and repairing them;

---

[62] *See id.* at Exh. 23, ECF No. 97-3, pp. 36-38.
[63] *See id.* at Exh. 25, ECF No. 97-3, pp. 44-46.
[64] There is certainly evidence of proposals: Draft Bars prepared proposals in August 2015, and one for the Bud and Burgers programs. But neither party argues those proposals resulted in a contract.
[65] Plaintiff's Opposition, ECF No. 104, p. 10:11-12.

2.      Draft Bars would activate the BarPods at its
own expense for non-Anheuser-Busch
events throughout the United States;

3.      Draft Bars would negotiate the expenses
with each event;

4.      Anheuser-Busch would provide the beer for
the events; and

5.      Draft Bars could advertise the assets to the
marketplace, as long as it sold Anheuser-
Busch product.[66]

Draft Bars maintains that it made this offer, and Opsahl's email constitutes Anheuser-Busch's acceptance of that offer.  As alleged, Anheuser-Busch received marketing as well as maintenance, storage and repairs for the Bar Pods.  Draft Bars obtained the use of the Bar Pods, product for the Bar Pods, and the chance to make money by "managing" them at events for Anheuser-Busch and its distributors.  Draft Bars has alleged, and supported, the terms of a valid contract for its use of the Bar Pods.

Anheuser-Busch notes that it awarded a contract for the management of its mobile assets to another company, Fusion Management.  It has also demonstrated that Draft Bars knew that it was not chosen to manage its mobile assets and that Fusion was.  The award of the contract to Fusion to operate and manage its mobile assets does not preclude a separate contract with Draft Bars that permitted Draft Bars to use the Bar Pods that it had constructed.  Indeed, Draft Bars details numerous instances where Anheuser-Busch acknowledged this arrangement.[67]  And the parties' actions support such an arrangement as Anheuser-Busch continued to permit Draft Bars to mobilize, manage, and store Anheuser-Busch's Bar Pods.  Construing the facts in favor of

---

[66] *Id.* at 10:13-19.

[67] *See, e.g.,* email from Mortimer to Lloyd, *id.* at Exh. 10, ECF No. 104-1, pp. 72. ("[W]e are allowing him to operate the units and charge the respective wholesalers or properties for his services *just like he has been doing*.") [emphasis added].

Draft Bars, there is a genuine dispute as to the existence of contract based on these terms and Draft Bars' performance in 2015 and 2016.

### A.    Lost Profits are not Recoverable for Contracts Terminable at Will

Anheuser-Busch contends that even if there was a contract with Draft Bars, Draft Bars cannot recover lost profits because the contract was terminable at will.  In support of its argument, it directs the court to *Dalton Props., Inc. v. Jones*, 683 P.2d 30, 31 (Nev. 1984), which involved a contract terminable at will.  There, the Nevada Supreme Court held that "[w]here a contract provides that either party may terminate the agreement at will, the party so terminated may not recover damages for those profits that he purportedly could have gained over the maximum life of the contract." This is because "[s]ince a party to a contract which is terminable at the will of another cannot rely on duration of the contract, if damages for lost profits were permitted, the injured party would be in a better position than the terms of the contract allowed."[68]

Anheuser-Busch reasons that any contract with Draft Bars was terminable at will because the contract was of indefinite duration. As a matter of law, contracts of perpetual duration are terminable at will.[69] Discussing the certainty of terms in contract formation, the Restatement (Second) of Contracts noted that "[v]alid contracts are often made which do not specify the time for performance."[70]  The Restatement further explains that "[w]hen the contract calls for

---

[68] *Id.*

[69] *See Aspex Eyewear, Inc. v. Vision Serv. Plan*, 472 F. Appx. 426, 427 (9th Cir.2012) (applying California law, the court stated: "A contract with 'neither an express nor an implied term of duration' is 'usually construed as terminable at will.").  *But see Alpha Distrib. Co. of California v. Jack Daniel Distillery*, 454 F.2d 442, 448–49 (9th Cir. 1972) ("[I]n some cases the nature of the contract and the totality of surrounding circumstances give no suggestion as to any ascertainable term. In such cases the law usually implies that the term of duration shall be at least a reasonable time, and that the obligations under the contract shall be terminable at will by any party upon reasonable notice after such a reasonable time has elapsed. This rule is generally applicable, for instance, to exclusive sales agency and distributorship contracts.")

[70] Restatement (Second) of Contracts § 33, cmt.d (1981).

15

successive performances but is indefinite in duration, the contract is commonly terminable by either party, with or without a requirement of reasonable notice."[71]

Additionally, Anheuser-Busch characterizes any contractual relationship formed with Draft Bars under the Sustainable Market Agreement as an independent contractor relationship. It reasons that this result would flow from the imposition of its standard terms and conditions used in any contract concerning the Bar Pods.[72] Such a term was not included in the November 15, 2015 Opsahl email. But Draft Bars does not dispute the characterization of its relationship with Anheuser-Busch as that of an independent contractor. Draft Bars' status as an independent contractor is significant, as Nevada law provides that "[a]bsent a contractual provision to the contrary, an independent contractor . . . relationship is terminable at any time at the will of the principal or the agent."[73] As explained above, Draft Bars cannot recover lost profits on a contract that is terminable at will.[74]

Draft Bars does not dispute Anheuser-Busch's legal arguments. Instead, it argues that the Sustainable Market Agreement was a contract for a defined duration. Draft Bars contends that Anheuser-Busch agreed to a term of "many years." To support this proposition it offers Opsahl's March 2016 testimonial, in which Opsahl described Draft Bars' customer service as the sort that ensured Anheuser-Busch would "continue to do business with these guys for many years to come."[75] Draft Bars also relies on Manion's declaration, which states: "Through late 2015 and the first half of 2016, [Anheuser-Busch] repeatedly confirmed that the agreement would be in

---

[71] *Id.; see also* Nevada's Uniform Commercial Code, N.R.S. 104.2309(2).

[72] *See, e.g.*, Defendant's Motion, Exh. 5, ECF No. 97-2, p. 41, ¶ 17 ("Contractor's relationship to Owner shall be that of an independent contractor.").

[73] *Kaldi v. Farmers Ins. Exch.*, 21 P.3d 16, 20 (Nev. 2001) (citing Restatement (Second) of Agency, § 117 cmt. a).

[74] *Dalton Props., Inc.*, 683 P.2d at 31.

[75] Plaintiff's Opposition, Exh. 19, ECF No. 104-1, p. 104

16

place for many years to come."[76]  Manion's declaration makes other similar references that any agreement was "to be years."[77]

Even though the court has found that there is a genuine dispute as to the formation of a contract for Draft Bars' use of the Bar Pods, there is nothing in the record that demonstrates there is a genuine dispute as to its term.  Manion has previously testified in his deposition that the terms of the Sustainable Marketplace Agreement were "open ended."[78]  Manion's declaration confirms that the agreement was not for any specific duration.  His comment that the agreement was to be for many years is not helpful.  An undefined term of multiple years is no more definite than an open-ended agreement.  Both fail to set a term for a contract between the parties.[79]

Anheuser-Busch challenges Manion's statements as a sham, contradicted by his prior deposition testimony.  The court need not address whether Manion's statements in his declaration must be stricken under the sham affidavit rule[80] as argued by Anheuser-Busch because, even accepting the statements, they do not create a genuine dispute as to whether the Sustainable Market Agreement was for a specific term.  Manion's statements that the agreement was for a number of years is just another way to say that there was no term.  Cast in slightly different terms, there is no evidence to support a finding that Anheuser-Busch agreed to any defined term for the Sustainable Market Agreement, even under Draft Bars' version of the agreement.  As the alleged Sustainable Marketplace Agreement did not include an express or

---

[76] *Id.*, Manion Declaration, ECF No. 104-1, p. 31 at ¶ 57.

[77] *Id.* at ¶ 53, *see generally* ¶¶ 56 and 58.

[78] Defendant's Motion, Exh. 1, ECF No. 97-2, p. 9 (Manion Depo. Tr. p. 162:5-12).

[79] There is some question as to whether contracts of indefinite terms are terminable only after a reasonable duration.  However, Draft Bars operated under the alleged contract for some period of time and has not argued that the contract was terminated prior to a reasonable duration.

[80] *See Dowie v. Fleishman-Hillard, Inc.*, 2006 WL 8434611, at *2 n.24 (C.D. Cal. July 28, 2006) (citing *Kennedy v. Allied Mutual Insurance Company*, 952 F.2d 262, 266-67 (9th Cir. 1991)) ("Where a party opposing summary judgment proffers an affidavit that contradicts or seeks to explain earlier deposition testimony, the court must make a factual determination as to whether the declaration is an attempt to create a 'sham' issue of fact and avoid summary judgment. If it makes such a finding, the declaration cannot be considered in ruling on the opposing party's motion.")

implied term of duration, it was terminable at will and Draft Bars cannot maintain an action for lost profits[81] under Nevada law.  The court reaches the same result based upon Draft Bars' failure to dispute its status as an independent contractor for Anheuser-Busch.

"Summary judgment is appropriate where asserted damages are unrecoverable, even if the underlying claim is valid."[82]  Plaintiff has not asserted any contractual damages other than lost profits based on a contract that was terminable at will.  For the reasons stated above, notwithstanding the genuine issue of material fact as to the existence of a contract between Anheuser-Busch and Draft Bars, summary judgment as to Count I is appropriate due to Draft Bars' inability to recover damages for breach of any contract that did exist.

## II.    The Implied Covenant of Good Faith and Fair Dealing

Anheuser-Busch reasons that because there was never a contract between it and Draft Bars for the management of the Bar Pods, the claim for breach of the implied covenant of good faith and fair dealing must also be denied.  In Nevada, "every contract imposes upon the contracting parties the duty of good faith and fair dealing."[83] A breach of the implied covenant may occur when the terms of a contract are complied with literally but one party to the contract thwarts the intention and spirit of the contract.[84] But, as Anheuser-Busch points out, if there is no

---

[81] In Draft Bars' response to Anheuser Busch's statement of undisputed facts (ECF No. 104-2, p. 9, ¶ 44), Draft Bars admits that its damages expert, Kevin Kirkendall, drafted a damages report that included only lost profits.  *See* Defendant's Motion, Exh. 44, ECF No. 97-4, pp. 78-80.

[82] *See Harrington v. Syufy Enterprises*, 931 P.2d 1378, 1380 (1997) (citing *Van Cleave v. Kietz–Mill Minit Mart*, 633 P.2d 1220 (1991)) ("[W]hen plaintiff cannot recover as a matter of law, defendant is entitled to summary judgment."); *May Trucking Company v. Andrus Transportation Services, Inc.*, 2011 WL 1720536, at *3 (D. Or. June 22, 2006) ("[P]laintiff has not demonstrated any damages that would be recoverable by it even if such a claim were viable. For these reasons, summary judgment on plaintiff's extortion claim is appropriate.")

[83]  *Charleston Rancho, LLC v. Stanley Convergent Security Solutions, Inc.*, 2019 WL 3754581, at *2 (D. Nev. Aug. 8, 2019) (dismissing claim for breach of the covenant of good faith and fair dealing for alleging the same conduct for the breach of contract claim and the claim for breach of the implied covenant, with leave to amend) [emphasis added] [internal citations omitted].

[84]  *Id.*

contract, there can be no breach of the implied covenant of good faith and no award for contract damages.[85]

As stated above, the court has concluded that there is a genuine issue of material fact regarding whether there was a contract between Anheuser-Busch and Draft Bars for the operation of the Bar Pods.  Accordingly, Anheuser-Busch's conclusory argument as to Count II is unpersuasive.  Nevertheless, in *Shaw v. Citimortgage, Inc.*,[86] the court declined to award damages for a breach of the implied covenant of good faith and fair dealing where damages were not available on the underlying breach of contract claim and the plaintiff failed to prove any other damages that could be awarded under the breach of implied covenant claim.

Moreover, in the same opinion, in determining whether the defendant breached the implied covenant of good faith and fair dealing, the United States District Court for the District of Nevada declined to consider the conduct that constituted an actual breach of the underlying contract.  In other words, "'It is well established that a claim alleging breach of the implied covenants of good faith and fair dealing cannot be based on the same conduct establishing a separately pled breach of contract claim.'"[87]  Draft Bars has not differentiated between the facts supporting its cause of action for breach of contract and those supporting its claim of breach of covenant of good faith and fair dealing.  Thus, for the reasons set forth in *Shaw*, summary judgment in favor of Anheuser-Busch as to Count II is appropriate.

---

[85] *Huck v. Countrywide Home Loans, Inc.*, 2011 WL 3274041, at *3 (D. Nev. July 29, 2011) (citing *Awada v. Shuffle Master, Inc.*, 173 P.3d 707, 714 (2007); *See also Branch Banking and Trust Co. v. D.M.S.I., LLC*, 871 F.3d 751, 763 (9th Cir. 2017) ("Absent a contract, there can be no implied covenant of good faith and fair dealing.") (discussing Nevada law).

[86] 201 F.Supp.3d 1222, 1254 (D. Nev. 2016).

[87] *Wells Fargo Bank, N.A. v. Commonwealth Land Title Ins. Co.*, 2019 WL 2062947, at *5 (D. Nev. May 9, 2019) (quoting *Shaw*, 201 F. Supp. 3d at 1252).

### III.    Unjust Enrichment

Draft Bars alleges that Anheuser-Busch was unjustly enriched "by refusing to take full possession of the Bar Pods and refusing to compensate Draft Bars for that service."[88] "Unjust enrichment" is an equitable doctrine and it arises where "a person has and retains a benefit which in equity and good conscience belongs to another."[89] "Unjust enrichment exists when the plaintiff confers a benefit on the defendant, the defendant appreciates such benefit, and there is acceptance and retention by the defendant of such benefit under circumstances such that it would be inequitable for [the defendant] to retain the benefit without payment of the value thereof."[90] A benefit under the doctrine of unjust enrichment includes "services beneficial to or at the request of [another], denotes any form of advantage, and is not confined to retention of money or property."[91]

Anheuser-Busch argues that Draft Bars' damages for unjust enrichment are limited to management-related costs incurred after Anheuser-Busch retrieved the Bar Pods from Draft Bars. Anheuser-Busch contends that any such costs incurred prior to that time were Draft Bars' responsibility under the asserted contract.

In response to Anheuser-Busch's argument, Draft Bars has clarified its unjust enrichment claim. It asserts that Anheuser-Busch terminated Draft Bars' right to manage the Bar Pods in June 2016, but continued to store four Bar Pods with Draft Bars from June to December 2016. Draft Bars has detailed the resulting costs for maintaining, cleaning, and storing the four Bar Pods for six months, and calculates its damages for unjust enrichment at $47,800. Draft Bars

---

[88] Plaintiff's Opposition, ECF No. 104, p. 16:14-15.
[89] *Leasepartners Corp. v. Robert L. Brooks Trust Dated November 12, 1975*, 942 P.2d 182, 187 (Nev. 1997).
[90]  *Certified Fire Protection Inc. v. Precision Construction*, 283 P.3d 250, 257 (Nev. 2012) [internal citations omitted].
[91] *Id.*

bases its computation of damages on the Manion declaration, though he states that the

calculation is "consistent with Draft bars' [sic] proposal of August 2015."[92]

Anheuser-Busch raises a limited challenge to the sufficiency of the evidence supporting

Draft Bars' damage calculation for its unjust enrichment claim.  Specifically, Anheuser-Busch

argues that the calculation is impermissibly based on Draft Bars' proposal.  However, Anheuser-

Busch did not explain why Draft Bars' valuation of its services was an insufficient basis for

computing its damages.  Generally speaking, in the bankruptcy context an owner is entitled to

offer an opinion of its property.[93]  It reasonably follows that the owner of Draft Bars may offer

an opinion as to the value of its services.  Because there is a genuine dispute as to damages for

Draft Bars' claims for unjust enrichment, the court shall deny Anheuser-Busch's motion for

summary judgment as to that claim.

## VI.    Promissory Estoppel

Draft Bars asserts a claim for promissory estoppel against Anheuser-Busch.  An essential

element of a promissory estoppel claim is "the existence of a promise or conduct the party to be

estopped intended to be acted upon." [94]  Moreover, "[t]he promise giving rise to a cause of action

for promissory estoppel must be clear and definite, unambiguous as to essential terms, and the

promise must be made in a contractual sense."[95] Consequently, "a cause of action will not be

supported by a mere promise of future conduct."[96]  In addition to the requirement of a clear,

definite and enforceable promise, a plaintiff asserting a promissory estoppel claim also must

prove detrimental reliance.[97] Under the doctrine of promissory estoppel, a promise that

---

[92] Plaintiff's Opposition, Exh. 1, ECF No. 104-1, p. 32, ¶ 65.
[93] *Enewally v. Wash. Mutual Bank (In re Enewally)*, 368 F.3d 1165, 1173 (9th Cir. 2004) ("In the absence of contrary evidence, an owner's opinion of property value may be conclusive.").
[94] *Torres v. Nev. Direct Ins. Co.*, 353 F.3d 1203, 1209 (2015).
[95] *Id.*
[96] *Id.*
[97] *Id.*

foreseeably induces reliance on the part of the promise, may be enforced despite the absence of consideration.[98]

Anheuser-Busch sought summary judgment on this claim for largely the same reasons it sought summary judgment on the unjust enrichment claim: Draft Bars had failed to establish any damages.  In its opposition, Draft Bars fails to distinguish between its claims for breach of contract and unjust enrichment on the one hand and promissory estoppel on the other.  Based on this Anheuser-Busch argued in its reply that Draft Bars had abandoned its claim for promissory estoppel.

It is unclear whether Draft Bars abandoned its claim for promissory estoppel as Anheuser-Busch was the one that lumped the claims for unjust enrichment and promissory estoppel together in its motion.  Draft Bars simply followed that lead and generically opposed the arguments as to the "reliance-based claims."  Still, Draft Bars has failed to set forth a separate promise on which it relied in storing the Bar Pods.  There being no separate promise to support Draft Bars' claim for promissory estoppel, the court shall grant summary judgment in favor of Anheuser-Busch as to Count IV.

**V.    Setoff Under 11 U.S.C. § 553**

Anheuser-Busch pre-paid Draft Bars $636,618 for a final Bar Pod that was never constructed. Anheuser-Busch has filed a proof of claim against the estate in that amount for Draft Bars' breach of contract to construct the final Bar Pod.  Draft Bars has not denied the debt. Anheuser-Busch seeks summary judgment in favor of its affirmative defense of setoff preserved under 11 U.S.C. § 553.  While liability has not been established, Anheuser-Busch seeks to

---

[98] *See Nieto v. Litton Loan Servicing, LP*, 2011 WL 797496, at *3 (D. Nev. Feb. 23, 2011) (citing *Pink v. Busch*, 691 P.2d 456, 459 (Nev .1984); Restatement (Second) of Contracts § 90 (1981)) ("Promissory estoppel is an equitable doctrine whereby a party who reasonably relies to his detriment on the promise of another may enforce a verbal contract against the other party, though the other party has given no consideration; it is a substitute for consideration.").

establish that any damages awarded to Draft Bars are subject to being setoff against its proof of claim.[99]

With exceptions that are not applicable here, § 553 of the Bankruptcy Code provides that bankruptcy does "not affect any right of a creditor to offset a mutual debt owing by such creditor to the debtor that arose before the commencement of the case . . . against a claim of such creditor against the debtor that arose before the commencement of the case…."[100]  Though the Bankruptcy Code codifies the right of setoff in bankruptcy, the right remains grounded in applicable nonbankruptcy law.[101]  In this instance, Nevada law governs.

To establish a setoff in bankruptcy, the creditor must prove that "(1) the debtor owes the creditor a prepetition debt; (2) the creditor owes the debtor a prepetition debt; and (3) the debts are mutual."[102]  Interestingly, Draft Bars does not dispute that these conditions were met.  Rather, it simply argues that it would be inequitable to permit Anheuser-Busch to setoff any damages from its claims against the proof of claim.  Indeed, the right to setoff is discretionary.[103]  And courts have denied setoff on equitable grounds.[104]

Yet, the Ninth Circuit Bankruptcy Appellate Panel has observed that "the setoff right is an established part of our bankruptcy laws [and] should be enforced 'unless compelling circumstances' require otherwise."[105]  Moreover, because "[s]etoffs in bankruptcy have been 'generally favored,' … a presumption in favor of their enforcement exists."[106]  Draft Bars fails to

---

[99]  Anheuser-Busch has asserted an affirmative defense for setoff.  ECF No. 19, p. 10, ¶ 55.
[100]  11 U.S.C. § 553(a).
[101]  *Faasoa v. Army & Air Force Exchange Svc. (In re Faasoa),* 576 B.R. 631, 637 (Bankr. S.D. Cal. 2017).
[102]  *Id.* at 637 (citing *United States of America v. Carey (In re Wade Cook Fin. Corp.),* 375 B.R. 580, 594 (B.A.P. 9th Cir. 2007)).
[103]  *United States of America v. Gould (In re Gould)*, 401 B.R. 415, 429 (B.A.P. 9th Cir. 2009).
[104]  *In re Faasoa,* 576 B.R. at 638-39 (collecting cases).
[105]  *Id.* (citing *Camelback Hosp., Inc. v. Buckenmaier (In re Buckenmaier),* 127 B.R. 233, 237 (B.A.P. 9th Cir. 1991)).
[106]  *In re Gould,* 401 B.R. at 423 (citing *Carolco Television, Inc. v. Nat'l Broad. Co. (In re DeLaurentis Entm't Group Inc.)* 963 F.2d 1269, 1277 (9th Cir. 1992)).

demonstrate any compelling circumstances.  The prospective harm resulting from setoff would be that the estate recovers less, or nothing, after netting out the mutual prepetition debts.  But that is the natural consequence of setoff which is statutorily protected in bankruptcy.  The diminution, or even defeat, of any recovery is not a compelling circumstance to deny setoff.  Because Draft Bars has not presented any genuine dispute regarding Anheuser-Busch's right to setoff mutual, prepetition debts, the court concludes that Anheuser-Busch may setoff any mutual, prepetition debts it may owe to the estate as a result of this adversary.

### CONCLUSION

For the reasons stated above, summary judgment is GRANTED in favor of Anheuser-Busch on Count I. While the issue of the existence of the Sustainable Marketplace agreement is narrowly decided in favor of Anheuser-Busch, no genuine issue of material fact exists regarding whether the Sustainable Marketplace agreement was terminable at will, and thus Draft Bars may not recover lost profits damages under Nevada law.

Summary judgment is GRANTED in favor of Anheuser-Busch on Count II.  Draft Bars has failed to delineate which, if any, conduct of Anheuser-Busch's constitutes solely a breach of the covenant of good faith and fair dealing and not also grounds for the breach of contract claim; and Damages are not available under the underlying breach of contract claim, and Draft Bars has not proven any other damages that could be awarded under Count II.

Summary judgment is DENIED as to Count III as there is a triable issue of material fact.

Summary judgment is GRANTED in favor of Anheuser-Busch on Count IV as Draft Bars has failed to establish a promise necessary to support its claim for promissory estoppel.

//

Finally, summary judgment is GRANTED in favor of Anheuser-Busch's affirmative defense of setoff and it may setoff any mutual, prepetition debts it may owe to the bankruptcy estate as a result of this adversary against its prepetition claim against Draft Bars.

The court shall prepare a separate order memorializing this ruling.

\* \* \* \*

**Copies sent via CM/ECF ELECTRONIC NOTICING.**

# # #